UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


ERECTION SPECIALISTS, INC.,   )
   )
      Plaintiff,   )
   )
v.   )   No. 3:00-CV-281
   )   (Shirley)
EDWARDS DEUTZ DIESEL, INC.,   )
and DEUTZ CORPORATION,   )
   )
      Defendants.   )


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the

Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings,

including entry of judgment [Doc. 29]. The Court conducted a non-jury trial in this matter on

November 8, 9, 10, 12, and 18, 2004.

This is a diversity action involving the sale, installation, and subsequent repair of a

construction crane engine. The owner of the crane, Plaintiff Erection Specialists, Inc. ("ESI"),

brings suit against the seller of the crane engine, Defendant Edwards Deutz Diesel, Inc.

("Edwards")[1] and Deutz Corporation ("Deutz"), alleging causes of action for breach of contract;

breach of express and implied warranties; negligent, intentional and/or fraudulent misrepresentation;

and unfair or deceptive acts or practices under the Tennessee Consumer Protection Act ("TCPA"),

Tenn. Code Ann. § 47-18-101, *et seq.* Plaintiff seeks consequential and incidental damages,

---

[1]This Defendant subsequently has been renamed Edwards Diesel & Tractor Co., Inc

prejudgment interest, attorney's fees, as well as an award of punitive and treble damages under the TCPA.

Plaintiff ESI is a corporation organized and existing under the laws of the State of Tennessee with its principal place of business located on Strawberry Plains Pike, Knoxville, Tennessee. ESI is a sophisticated, experienced user of heavy equipment, including cranes. Defendant Edwards, which is a corporation located in Wilton, Alabama, was an authorized distributor of Deutz diesel engine and parts from 1987 until August 1, 2000. Defendant Deutz, a corporation which has its principal place of business in Norcross, Georgia, is a wholly owned subsidiary of Deutz, A.G., the German manufacturer of Deutz diesel engines and parts, and is responsible for all sales of Deutz diesel engines and parts within the United States.

In December, 1998, Ron Sharp, Vice President of ESI, contacted Frank Edwards, President of Edwards Deutz Diesel, requesting a replacement for the existing air-cooled Deutz engine in ESI's P&H 35-ton all-wheel-drive crane. Sharp specified that he wanted as a replacement a water-cooled Deutz engine with similar horsepower ("HP") and revolutions per minute ("RPM"). The original engine developed 237 HP at 2300 RPM. Sharp was aware that a water-cooled engine was a non-standard engine for this type of crane.

Edwards initially proposed replacing the engine with a Deutz model BF6M1013CP ("1013CP"), which he happened to have in stock at the time. This particular model had a rating of 241 horsepower at 2300 RPM, which was the approximate rating of the original engine. The 1013CP engine came equipped with a self-contained cooling system manufactured by Deutz A.G., the German manufacturer of Deutz engines and parts. By fax transmission on December 14, 1998, Edwards made inquiry to the Applications Engineering Department of Deutz as to whether the

2

1013CP "engine [could] be put in this crane (on/off highway)." Edwards' fax also noted the identification number of the transmission that was on the crane. Deutz Applications Engineer Brad Wilson responded by fax on the same date, pointing out that neither the original engine to be removed, nor the proposed replacement, appeared to be highway approved, but that, in any event, the proposed replacement (the 1013CP engine) appeared to be a "good fit" insofar as horsepower and size issues were concerned. Wilson also pointed out that there might be issues with respect to connecting the proposed replacement engine to the existing transmission.

Sharp and Edwards agreed to a contract for the installation of a 1013CP engine for the price of $16,802.19. Edwards represented that the installation would take two to three weeks, and that the engine was covered by a one-year warranty for parts and labor.

ESI delivered the crane to Edwards on December 21, 1998. Edwards began work on the installation in January, 1999. After receiving some information from Deutz regarding possible means of connecting the proposed replacement to the transmission, Edwards set out to install the 1013CP engine on the plaintiff's crane. In doing so, he discovered that the 1013CP engine would not fit in the crane. Edwards asked Sharp if he could cut the frame in order to make the engine fit, but Sharp refused, as he was concerned about the crane's structural integrity. Edwards proposed installing an alternative engine, Deutz model BF61013ECP ("1013ECP"). This model did not come with a self-contained cooling system and required an ancillary cooling system to be installed by Edwards. Sharp agreed to the alternative engine, and Edwards ordered the 1013ECP engine from Deutz. Edwards subsequently installed the engine and designed and built an ancillary cooling system, which he installed on the crane. The 1013ECP engine was rated 261 horsepower at 2500 RPM.

Edwards testified that he recalled discussing with either Enrique Sauerteig or Brad Wilson of Deutz about calibrating the engine to 2300 RPM. However, Edwards had no documents evidencing such a request. Further, Brad Wilson testified that no such request was ever made with respect to the 1013ECP engine.

The crane was delivered back to ESI in Knoxville on May 12, 1999. After approximately fifteen (15) hours of use, on May 28, 1999, the engine failed. ESI immediately notified Edwards about the problem and requested a new engine. When Edwards contacted Deutz, he was advised that Deutz would not replace the engine, but that it would approve a complete rebuild of the damaged parts under the warranty.

The engine was removed and taken to Edwards' shop in Alabama. Edwards ordered the appropriate parts for the engine rebuild, but the parts delivery was delayed for approximately 55 days because of an inventory problem at the Deutz facility. Deutz accepted responsibility for this delay in correspondence to Edwards. The repairs were completed around August or September, 1999. ESI, however, continued to experience difficulties with the crane after the repair. These mechanical problems appeared to be related to the fuel rack or the fuel delivery system. Edwards attempted to repair the engine at ESI's request and, in so doing, replaced the fuel lines in September, 1999. ESI, however, continued to have problems with the engine.

As a distributor of Deutz, Edwards was assigned a geographic region which consisted of Alabama and the greater portion of the Florida panhandle. Another Deutz distributor, IPC Corporation, was assigned the area which included East Tennessee, the region where ESI is located. The network of Deutz distributors, of which Edwards was one, acting through their Distributor's Council, had implemented a number of rules and regulations which each distributor was to follow

4

in connection with their sales and service of Deutz products. One such rule was that each distributor was to limit its sales and service efforts to customers located within the geographic region to which that distributor was assigned. Under the rules and regulations implemented by the Distributor's Council, Deutz is assigned the responsibility of enforcing the various rules. In December, 1999, Deutz removed Edwards from the claim process, replacing Edwards with IPC Corporation for the purpose of doing the warranty work on the Deutz engine installed in ESI's crane. Edwards was not allowed to do any further warranty work for Deutz on the crane.

By correspondence dated December 13, 1999, Plaintiff's counsel notified both Edwards and Deutz that ESI was of the opinion that the Defendants had "been given sufficient time to repair the engine under the Uniform Commercial Code." ESI demanded a return of the purchase price paid to Edwards ($16,802.19), reimbursement of the costs of transporting the crane to and from Wilton, Alabama ($1,800.00), and lost revenue for a period of twelve months, calculated at the rate of $3,000.00 per month. Plaintiff's counsel further advised that the subject engine could be picked up at the Plaintiff's place of business after receipt by Plaintiff of the above-referenced amounts.

At the request of Deutz, IPC sent Wylie Austin, a representative from Covington Diesel, to the ESI facility on December 14, 1999, to remove the engine from the crane and take it to Atlanta, Georgia, for inspection and correction of any warrantable deficiencies. When Austin arrived at ESI, he was advised that the engine "was under litigation" and that if he performed the removal of the crane, he may be a potential witness. As a result of these communications, and at the request of his employer, Austin left the premises without the engine and did not return.

On December 15, 1999, Plaintiff's counsel sent a letter to Al Smith, Manager of Product Services at Deutz Corporation, noting "that the engine was not picked upon on December

14, 1999 by your distributor due to the impeding litigation." In a fax dated December 16, 1999,

Smith replied to this letter stated as follows:

> I can't imagine this matter becoming the subject of litigation,
> therefore, I don't see any value in holding up what appears to be a
> legitimate warrantable repair. Having said that, we accept your
> position and will so notify IPC.

Following this correspondence, neither Deutz nor IPC made any further attempt to perform any

warranty work and/or repairs to ESI's crane. At no time subsequent to the Plaintiff's receipt of the

Smith's December 16, 1999 fax, or prior to the filing of this lawsuit on April 2, 2000, did Plaintiff

make any inquiry of Deutz as to why the fuel rack or any other problems with the engine had not

been repaired and/or whether the fuel rack or any other problems would be repaired.

ESI attempted to have the repairs performed by other companies. ESI approached

Robert Renegar, ESI's crane dealer, for recommendations of his customers to make the repairs.

Renegar refused to allow his dealership to make the repairs, nor would he recommend any of his

customers, due to his concerns about voiding the warranty on the engine and also about the

impending litigation. ESI also sought repairs from Thoroughbred Diesel. They repaired the sticking

fuel rod shut-off solenoid and sold ESI a repair manual. ESI also solicited Roger Hooks of Diesel

Sales & Service in Lake City, Tennessee. Hooks refused to repair the crane for the same reasons

cited by Renegar.

In April 2000, ESI filed the present civil action against Defendants Edwards and

Deutz. Thereafter, Deutz filed a cross-claim against Edwards, for breach of the parties'

distributorship agreement. Following the filing of the lawsuit, there was a period of inactivity,

during which no attempts were made by any party to repair or replace the crane engine. In June,

2001, representatives of Deutz, IPC, and ESI met at the ESI facility in Knoxville for the purpose of

examining the crane. As a result of this examination, Deutz proposed to Defendant Edwards and Plaintiff ESI that all parties to the litigation conduct a joint examination of the engine and installation in an effort to determine the cause of the overheating and any other problems experienced by the Plaintiff.

The parties conducted a joint examination of the engine and installation on September 4 and 5, 2001. Present were Ronald Sharp, Edward Sharp, Tom Gunnels, and attorney Tom Monceret for the Plaintiff; Frank Edwards and attorney Rick Hollow on behalf of Defendant Edwards; and Marv Spurlin, Jim Oldham, and attorney David Hill on behalf of Deutz Corporation. At the conclusion of the examination, Deutz Chief Applications Engineer Jim Oldham and Deutz National Service Manager Marv Spurlin determined that the engine continued to overheat as a result of an insufficient cooling system, which was designed, fabricated and installed by Defendant Edwards as part of the initial installation work. Specifically, Oldham and Spurlin concluded that the cooling system was not properly designed and laid out by Edwards, and that there was an obstruction within the radiator, all of which resulted in the overheating of the engine. Spurlin further determined that the cause of the Plaintiff's difficulties in starting the engine resulted not from a problem with the engine, but a problem in the electrical system within the cab of the crane.

Defendant Edwards offered to acquire a new engine and cooling system, at its own expense, in an effort to resolve the problem with the crane. Deutz agreed to sell Edwards a new replacement engine. As requested by Edwards, Deutz provided Edwards with certain technical data for use in the design of the cooling system. On September 7, 2001, Marv Spurlin of Deutz Corporation sent Frank Edwards a facsimile, which states, in pertinent part, as follows:

> Attached you will find the specification for the engine that we spoke
> about over the phone. This engine is in inventory and you may place

7

> the order direct with our engine sales department. Once we receive
> your order we will calibrate a governor for the 2300 RPM setting that
> you requested with a power output of 265 HP.

[Ex. 90].

Deutz delivered the replacement engine to Edwards on September 11, 2001. Defendant Edwards experienced delays in obtaining a replacement cooling system from the fabrication company with whom Edwards had contracted to design and build such a system, which resulted in delays on the part of Defendant Edwards in completing the installation of the new replacement engine and the new replacement cooling system.

In January, 2002, during the course of installing the replacement engine and cooling system, Frank Edwards fell and broke his leg, which resulted in additional delays on the part of Edwards in completing the installation. The installation was completed in February, 2002. The crane is now operable and is being used on job sites; however, ESI claims that it must be transported to job sites, as the crane fails to develop sufficient horsepower.

### Breach of Contract

Plaintiff's first claim is for breach of contract. Specifically, Plaintiff alleges that Defendants Deutz and Edwards jointly and severally breached the parties' contract to replace plaintiff's crane engine with a suitable, serviceable replacement engine. In connection with this claim, Plaintiff alleges that Edwards acted as Deutz's agent when Edwards undertook to install and later repair Plaintiff's crane engine and offered an oral warranty.

To assert a claim for breach of contract, a plaintiff must show the following: "(1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach." Life Care Centers of America, Inc. v. Charles Town Associates Ltd. Partnership, 79 F.3d 496, 514

(6th Cir. 1996). Based upon the evidence presented at trial, the Court finds that a contract for the replacement of the crane engine existed between Edwards and ESI. The Court further finds that Edwards breached its contract with ESI by failing to provide a suitable replacement engine for the crane. While the first engine ordered was of an appropriate horsepower, it did not physically fit within the crane. The second engine ordered, the 1013ECP, required an auxiliary cooling system. The evidence shows that this cooling system, as designed and constructed by Edwards, was inadequate and improperly designed, resulting in the engine overheating and subsequent damage to the engine itself, in particular the cylinders.

The Court does not find that the initial delay in the installation of the engine constitutes a material breach of the contract. While the 1013CP engine was not delivered and installed in the two to three week time period projected by Edwards, and the 1013ECP was not installed and delivered until May, 1999, at no time during this period did ESI terminate or seek to terminate its contract with Edwards and seek to obtain an engine elsewhere. Furthermore, ESI accepted delivery of the engine in May, 1999, and while such acceptance did not waive ESI's objections to the fitness of the engine, as will be discussed in greater detail below, it did constitute a waiver of any objection to Edwards' failure to perform within the time frame originally projected. See United States ex rel. Shankle-Clairday, Inc. v. Crow, 414 F. Supp. 160 (M.D. Tenn. 1976).

The Defendant Deutz was not a party to the oral agreement between Edwards and Deutz. Moreover, at no time since the initial dealings between ESI and Edwards did Deutz enter into any contractual relationship with the Plaintiff. ESI seeks to impose liability on Deutz for breach of contract under a theory of agency. Whether an agency relationship exists is determined by the circumstances of the particular case and the conduct of the parties. Raines v. Shoney's, Inc., 909

9

F. Supp. 1070, 1078 (E.D. Tenn. 1995); Johnson v. LeBonheur Children's Med. Ctr., 74 S.W.3d 338, 343 (Tenn. 2002). Whether the principal exercises control over the conduct of the agent is "a significant factor" in determining whether an agency relationship exists. Raines, 909 F. Supp. at 1078; Johnson, 74 S.W.3d at 343.

Upon examining the conduct of the parties, the Court finds that Edwards did not act as Deutz's agent when he contracted with ESI. Plaintiff has failed to show the requisite control by Deutz which is required in order to impose liability on it for Edwards' actions with respect to the ESI contract. Plaintiff's claim of breach of contract against Deutz is therefore **DISMISSED**.

### Breach of Warranty

The Plaintiff asserts that Defendants Deutz and Edwards jointly and severally breached the express oral warranty, the implied warranty of merchantability, and the implied warranty for fitness for a particular purpose when they failed to provide a suitable replacement engine for the crane. Specifically, Plaintiff complains that the Defendants failed to provide an engine with the required horsepower and RPM, resulting in the crane's continuing incapacity to operate and transport itself to job sites. The Plaintiff seeks actual damages or, in the alternative, rescission of the contract, as well as consequential and incidental damages pursuant to Tenn. Code Ann. § 47-2-715 and punitive damages.

Edwards argues that, as an authorized distributor for Deutz, it had the authority to bind the manufacturer to a warranty as an agent, but that as a distributor, Edwards was not bound by that warranty. Edwards further asserts that it had no obligation to make any repairs to the engine, other than to correct defects existing at the time of sale.

10

Deutz, on the other hand, asserts that the only warranty that it issued in connection

with the engine that the Plaintiff purchased from Edwards is a limited one-year written warranty,

which provides, in pertinent part, that Deutz warrants the Deutz engines and parts which it sells to

"be free from defects in material and workmanship, under normal use and service."  The written

warranty further states as follows:

> UNDER NO CIRCUMSTANCES WILL THE CUSTOMER BE
> ENTITLED TO RESCISSION OR TO A REDUCTION IN THE
> PURCHASE PRICE OR TO ANY DIRECT, INDIRECT,
> INCIDENTAL OR CONSEQUENTIAL DAMAGES
> WHATSOEVER, INCLUDING BUT NOT LIMITED TO LOSS
> TIME, INCONVENIENCE, LOSS OF USE OF EQUIPMENT,
> COSTS OF RENTALS OR REPLACEMENTS OR OTHER
> COMMERCIAL LOSS.
>                          *        *        *
> IN LIEU OF ALL OTHER EXPRESS OR IMPLIED
> WARRANTIES OF DC [Deutz Corporation] AND THE
> MANUFACTURER WITH RESPECT TO DEUTZ DIESEL
> ENGINES AND DEUTZ DIESEL ENGINE PARTS, INCLUDING,
> WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF
> MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR
> PURPOSE.  NEITHER DC NOR THE MANUFACTURER
> ASSUMES, NOR AUTHORIZES ANY DISTRIBUTOR OR
> OTHER PERSON TO ASSUME, ON ITS BEHALF, ANY OTHER
> OBLIGATION OR LIABILITY.

Deutz argues that there is no proof that Deutz has breached the written warranty with

respect to any of the engines and/or engine parts installed in the Plaintiff's crane since December,

1998.  Deutz further contends that there is no implied warranty of merchantability or of fitness for

a particular purpose in connection with any of the Deutz engines or parts installed on the Plaintiff

crane.  Deutz contends that it was not a party to the original transaction between ESI and Edwards

and therefore did not know of the purpose for which the engine was to be used.  Deutz further denies

that the warranty has failed of its essential purpose.  Deutz contends that the losses alleged by the

11

Plaintiff are the direct and proximate result of the Plaintiff's own failure to allow Deutz to have access to the engine and crane; Plaintiff's failure to communicate with Deutz regarding the nature and extent of the Plaintiff's continuing problems; and Plaintiff's refusal to take reasonable efforts to limit or mitigate its damages.

It is undisputed that Deutz's written warranty, which expressly excludes the implied warranties of merchantability and of fitness for a particular purpose, was never delivered to ESI. Tennessee Code Annotated § 47-2-316 provides the various ways in which these implied warranties may be excluded. In the case of a writing, such exclusion must be conspicuous. Tenn. Code Ann. § 47-2-316(2). A written disclaimer that is not provided to the buyer until after the contract is entered into and delivery of the goods is complete is ineffective. See Cooper Paintings & Coatings, Inc. v. SCM Corp., 62 Tenn. App. 13, 19-20, 457 S.W.2d 864, 867 (1970). Because the limited one-year written warranty was never provided to ESI, Deutz is bound by the one-year oral warranty given by Edwards upon behalf of Deutz. As an authorized distributor, Edwards had authority to bind Deutz to the oral warranty. See McGee v. Nashville White Trucks, Inc., 633 S.W.2d 311, 314 (Tenn. Ct. App. 1982).

Paragraph 8.4 of the Distributorship Agreement [Doc. 66] executed by Deutz and Edwards provides as follows:

> Distributor undertakes that all of its sales of Deutz Products will be made in such a way that the purchaser will acquire all rights in accordance with the Deutz Limited Warranty only, to the exclusion of any other, further or different warranties, and that the written text of the appropriate Deutz Limited Warranty will be delivered to the customer at the time of and in connection with such sales. Distributor agrees to indemnify and hold Deutz harmless for all costs (including expenses and attorneys' fees), actions or damages to which Deutz may be exposed because of Distributor's failure to so deliver

12

> or because of Distributor's abnormal or non-standard purchase, use,
> application or recommendation of Deutz products.

The Court finds that Edwards' failure to deliver a copy of the applicable written limited warranty to the Plaintiff constitutes a material breach of the Distributorship Agreement, thereby rendering Defendant Edwards liable to Deutz for all such amounts which Deutz is obligated to pay to the Plaintiff, which would have been otherwise lawfully excluded, had a copy of the written warranty been delivered to the Plaintiff. Additionally, pursuant to ¶ 8.4 of the Distributorship Agreement, Edwards is liable for all costs, including expenses and attorneys' fees, incurred by Deutz in this litigation.

With respect to ESI's claim against Deutz for breach of warranty, the Court finds that Deutz satisfied its warranty obligations to ESI when Deutz replaced and paid for the installation of new pistons for the engine in May, 1999. However, there was a 55-day delay in providing those pistons, which the Court finds unreasonable under the circumstances. Accordingly, Deutz shall be liable to ESI for damages proximately caused by this unreasonable delay in providing the warrantied replacement parts. With respect to the other problems experienced by the Plaintiff in 1999, the evidence preponderates that these problems were the result of the inadequate cooling system that was designed and installed by Edwards, as opposed to any defect or problem with the engine provided by Deutz, and thus were not subject to any warranty claim.

Next, the Court considers the Plaintiff's claim for breach of the implied warranty of merchantability. To be "merchantable," goods must, among other things, (1) "pass without objection in the trade under the contract description" and (2) be "fit for the ordinary purposes for which such goods are used." Tenn. Code Ann. § 47-2-314(2)(a), (c). In the instant case, there is no evidence to indicate that the 1013ECP engine was not merchantable within the meaning of Tenn.

13

Code Ann. § 47-2-314. While it is undisputed that at least some of the pistons were damaged after just a few hours of operation, the evidence preponderates that the pistons were damaged as a result of the inadequate cooling system designed and installed by Edwards, and not a result of any condition or defect existing at the time of sale.

The Court further finds that Deutz did not breach the implied warranty of fitness for a particular purpose with respect to the 1013ECP engine installed in 1999. There is no evidence to indicate that Deutz was aware of the particular purpose for which the engine was required, nor is there any proof that ESI relied upon Deutz's skill and judgment in selecting the engine. See Tenn. Code Ann. § 47-2-315. Indeed, Deutz was not even aware that the 1013ECP engine ordered by Edwards was intended for ESI until well after the engine was sold and installed. As such, Plaintiff's claims for breach of implied warranties must fail.

### Misrepresentation/Tennessee Consumer Protection Act

Plaintiff also asserts claims of negligent, intentional, and/or fraudulent misrepresentation, claiming that Deutz and Edwards repeatedly misrepresented to the Plaintiff that they had the capacity and the intent to repair or replace the engine. Alternatively, Plaintiff alleges that the Defendants violated the Tennessee Consumer Protection Act by representing to the Plaintiff that they would perform repairs or replace the defective part of the engine, but failed to do so.

To assert a claim for negligent misrepresentation, a plaintiff must show the following elements: (1) a false representation with respect to a past or existing material fact; (2) that the defendant made the representation without exercising reasonable care; (3) that the defendant made the statement with the intent of inducing the plaintiff to rely upon it; (4) that the plaintiff was unaware of the falsity of the statement and acted in justifiable reliance upon the statement; and (5)

14

damages. Cashia v. Hancock, M1997-00252-COA-R3-CV, 2002 WL 1466058, at **12-13 (Tenn. Ct. App. July 9, 2002), perm. app. denied Oct. 28, 2002. The elements of an intentional representation are essentially the same, except that a plaintiff must prove that the representation was made with the intent to defraud the plaintiff. Id. at *13. To establish a claim for fraudulent misrepresentation, the plaintiff must establish that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity. Shahrdar v. Global Housing, Inc., 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998). Finally, to establish a claim under the Tennessee Consumer Protection Act, a plaintiff must establish that the defendant engaged in an unfair or deceptive act, as specified in the Act, that caused the plaintiff an ascertainable loss. Tenn. Code Ann. § 47-18-109(a)(1); Hall v. Hamblen, M2002-00562-COA-R3-CV, 2004 WL 1838180, at *4 (Tenn. Ct. App. Aug. 16, 2004).

The Court finds that there has been no showing that any representations made by either Deutz or Edwards regarding the repair or replacement of the engine constitute a misrepresentation. The Plaintiff has failed to establish that any representations by the Defendants were made without reasonable care, knowingly or with the intent to defraud. Moreover, the Court cannot say that any representations made to the Plaintiff regarding the repair of the engine constituted an unfair or deceptive practice within the meaning of the Tennessee Consumer Protection Act. Accordingly, Plaintiff's claims for misrepresentation and for a violation of the TCPA are **DISMISSED**. Plaintiff's request for an award for punitive damages, attorney's fees, and treble damages under the TCPA are also dismissed.


**Damages**

Having found that Edwards is liable to ESI for breach of contract in connection with the installation of the 1013ECP engine and auxiliary system in 1999, and that Deutz is liable to ESI for the unreasonable delay in providing replacement parts under warranty for the 1013ECP engine, the Court now turns to the issue of damages.

Plaintiff claims that it is entitled to rescission of the contract and to recover actual damages for cylinder repair (specifically, for repair of hydraulic seals that rotted from lack of use, plus the cost of a service manual); consequential and incidental damages, including lost profits stemming from the loss of use of the crane from May, 1999 to the present; the cost of transporting the crane to job sites from June 10, 2002 to the present; as well as pretrial and post-judgment interest. Defendants, on the other hand, argue that ESI is precluded from recovering any damages in this case because ESI failed to make any reasonable attempts to mitigate its damages.

A purchaser claiming entitlement to consequential damages under the Uniform Commercial Code has a duty to take reasonable efforts to mitigate its claimed losses. Tenn. Code Ann. § 47-2-715(2)(a) ("Consequential damages resulting from the seller's breach include . . . any loss . . .which could not reasonably be prevented by cover or otherwise . . ."). "Generally, one who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that his damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover." Cook & Nichols v. Peat, Marwick, Mitchell & Co., 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971). "The critical factor in determining fulfillment of a plaintiff's duty to mitigate is whether the method which he employed to avoid consequential injury was reasonable under the circumstances existing at the time." Tampa

Elec. Co. v. Nashville Coal Co., 214 F. Supp. 647, 652 (M.D. Tenn. 1963). The breaching party has the burden of showing that the injured party's losses "could have been avoided by reasonable effort and expense." Id. An injured party is not required, however, to make extraordinary efforts. Carolyn B. Beasley Cotton Co. v. Ralph, 59 S.W.3d 110, 115 (Tenn. Ct. App. 2000), perm. app. denied May 21, 2001. Specifically, an injured party is not required to mitigate damages if to do so would be impossible or unduly burdensome. See Cummins v. Brodie, 667 S.W.2d 759, 766 (Tenn. Ct. App. 1983).

The Sharps testified that they attempted to have the engine repaired by others, but that they were repeatedly refused, primarily because the matter was already involved in litigation and because of concerns of voiding the engine warranty. In any event, the Sharps testified that they were without the necessary funds or collateral to invest any further money in the crane for repairs or to spend another $16,800 to replace the engine. ESI argues that the repeated assurances by Defendants after receiving notice of the problems also was sufficient justification to delay mitigation.

It is evident to the Court that ESI, during the period between May, 1999 and the present, has made little, if any, effort to mitigate its damages. The Court finds that there were a number of things which could have and should have been done by ESI to mitigate its damages, but it declined to do so. Essentially, ESI parked the crane, allowed it to deteriorate due to neglect and disuse, and simply asserted that it was the responsibility of one or more of the Defendants to make good the crane, its condition, and alleged resulting damages.

By demanding by letter dated December 13, 1999 that the engine be picked up and damages paid, and by turning away Mr. Austin on December 14, 1999 – or, at the very least, by not

17

advising him of the problems it was experiencing with the engine – ESI consciously exacerbated its condition and interfered with the opportunity to make needed corrections and/or evaluations of actual problems with the engine or its installation. This affirmative conduct by ESI, consciously and deliberately taken, was calculated to and did interrupt and interfere with the process of diagnosis and repair of any deficiencies in the engine and/or its installation. Certainly if the examinations, as carried out by representatives of Deutz on subsequent occasions, could have determined the alleged deficiencies in the cooling systems, the same deficiencies could have been ascertained in December of 1999 had ESI cooperated with Deutz, IPC and Covington Diesel instead of taking an aggressive counter position which had as its purpose the turning away and refusal of efforts on behalf of Deutz, IPC, and Covington Diesel to diagnose and correct any defects.

The Court finds that ESI, had it been less aggressive about notifying prospective vendors and others that it was pursuing litigation and that they would be drawn into the process, could have obtained the services of competent repair and correction facilities at a much earlier date. Moreover, the Court finds that ESI's claim that it was without the funds or collateral to obtain a replacement engine to be specious. ESI could have obtained a new engine and cooling system and obtained its installation, based upon all of the evidence introduced in this cause, for approximately $17,000.00 to $20,000.00. Van Elkins, ESI's own expert, conceded that he would advise any client of his that, if they could increase their revenue by $100,000.00 to $150,000.00 a year by the one-time expenditure of only $20,000.00, they should do so, even if it entailed borrowing funds.

The Court finds that as of December 30, 1999, a reasonable business entity, in the place and circumstance of the Plaintiff, would have taken all reasonable business measures to obtain and spend approximately $17,000.00 to $20,000.00 for the purchase of a new replacement engine

18

and cooling system, if by the expenditure of such sums, the business entity could have reasonably expected to have eliminated annual business losses in excess of $100,000.00. For these reasons, the Court holds that the Plaintiff is not entitled to an award of lost profits or any other damages beyond December 15, 1999.

Defendants take issue with the fact that the calculation of the Plaintiff's expert, Van Elkins, of the crane's contribution margin of $61.73 per hour was based upon the $87.50 per hour rental rate charged for the crane for relatively short-term jobs when the majority of the jobs for which the crane was used were long-term contract jobs for which the cost of operation of the crane was included in the overall contract price. Defendants argue that ESI has failed to demonstrate that there is some reasonable relationship between ESI's hourly rental rate and the amount of revenue actually by ESI on contract jobs. Further, Defendants contend that Plaintiff has failed to demonstrate that the projected lost hours for the subject crane equal to the actual lost hours for the crane, and that Plaintiff further has failed to provide evidence from which the Court can reasonably determine the extent to which the Plaintiff did or could have transferred jobs or work to other cranes within ESI's fleet.

Recovery of damages for breach of contract is permissible even if the exact amount of damages cannot be proven. See Cummins, 667 S.W.2d at 765. "Uncertain and speculative damages are prohibited only when the existence of damage is uncertain, not when the amount is uncertain." Id.

Elkins testified to a reasonable degree of accounting certainty that the contribution margin for this particular crane was $61.73 per hour, or $493.84 per day. The Court finds that this calculation is based upon sufficiently reliable and trustworthy data, and that an estimation of

Plaintiff's lost profits can be ascertained with the required degree of certainty. There was no showing that this rate is vastly different from the amount of profit realized by ESI through contract jobs. The Court finds that the hourly rental rate is a sufficient and reasonable basis for calculating the amount of damages.

The Court further finds that the Plaintiff presented sufficient evidence by which the Court may determine the approximate amount of lost hours and/or lost jobs for the period of May to December, 1999. Ron Sharp and Ed both testified that they lost over $100,000.00 per year due to the 35-ton crane being inoperative, based on their experience with this special purpose crane. Robert Coward, an ESI competitor, testified that he received three to four calls for his all-terrain crane per week from ESI and/or their customers while ESI's 35-ton crane was inoperative. Coward further testified that with a lesser crane, a 22-ton crane, his company earned $4,000.00 per week during the daylight savings time. Larry Galyon, an ESI customer, testified that he used ESI cranes exclusively. Galyon testified that, as a result of the 35-ton crane being inoperable, ESI lost a 12-month job and a 10-month job, as well as many air conditioner roof top lifts and other miscellaneous jobs, which would have required the crane for eight hours per day. Jerry Reed, another ESI customer, also testified about similar business opportunities that ESI lost due to the 35-ton crane being out of service. Finally, based upon the average number of hours that the crane operator worked on jobs in 1997 and 1998, Plaintiff's expert Elkins testified that the 35-ton crane would have been utilized an average of 1,873 hours per year, or 234 eight-hour days, which constitutes approximately 64% of the year. The Court finds that this evidence is sufficient to establish that, had the crane been operable between May 28, 1999 and December 15, 1999, the crane could have been used 64% of the time, or for 128 8-hour days, at a rate of $67.13 per hour.

20

For these reasons, the Court finds that the Plaintiff ESI shall be awarded a total of lost profit damages in the amount of $68,643.76. Based upon the Court's previous findings regarding the 55-day delay in delivering the necessary repair parts to Edwards, the Court finds that Defendant Deutz shall be liable for eight weeks of these lost profits, or $19,753.60. Defendant Edwards is liable to the Plaintiff ESI for the remainder of these lost profits, or $48,890.16. However, by virtue of Defendant Edwards' material breach of the Distributorship Agreement, Defendant Edwards is liable to Deutz on its cross-claim for $19,753.60, the amount which Deutz is obligated to pay to the Plaintiff, as such damages for lost profits would have been otherwise lawfully excluded under the written limited warranty. Furthermore, Defendant Edwards is liable to Deutz for all costs, including expenses and attorneys' fees, incurred by Deutz in this litigation.

Finally, Plaintiff seeks prejudgment interest on its award of damages. In evaluating a request for prejudgment interest, the Court "must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case." Myint v. Allstate Ins. Co., 970 S.W.2d 920, 927 (Tenn. 1998); Mitchell v. Mitchell, 876 S.W.2d 830, 832 (Tenn. 1994). The purpose of prejudgment interest "is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." Myint, 970 S.W.2d at 927. In addition to these equitable principles, the Tennessee Supreme Court has noted two other considerations to take into account in determining whether prejudgment interest is proper:

> The first criterion provides that prejudgment interest is allowed when the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds. The second provides that interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds.

Id. (citations omitted).

Having considered the relative equities and all of the evidence in this case, the Court declines to award prejudgment interest to the Plaintiff. The Plaintiff has been adequately compensated for its losses incurred in 1999, and, in the Court's view, the Plaintiff's failure to mitigate its damages would render an award of prejudgment interest inequitable in this case.

Postjudgment interest shall be awarded in accordance with the provisions of 28 U.S.C. § 1961.

An order consistent with these findings of fact and conclusions of law will be entered.

**ORDER TO FOLLOW.**

**ENTER:**

  s/ C. Clifford Shirley, Jr.  
United States Magistrate Judge